**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID E. HINA, ET AL.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. C2:  05-CV-0008** |
| | : | |
| **ANCHOR GLASS CONTAINER** | : | **JUDGE ALGENON L. MARBLEY** |
| **CORPORATION,** | : | |
| | : | **Magistrate Judge King** |
| **Defendant.** | : | |

## OPINION & ORDER

### I. INTRODUCTION

This matter comes before the Court on Defendant Anchor Glass Container Corporation's ("Anchor") Motion for Summary Judgment (doc. no. 78). For the reasons set forth below, this Court **DENIES** Anchor's Motion.

### II. BACKGROUND

#### A. Factual History

#### 1. Hina's Mill Experience

Plaintiff David Hina ("Hina") was employed by Anchor in 1969 until his accident on November 5, 2003. Anchor makes metal molds used to form molten glass into beverage bottles. Anchor uses a mill to cut cooling grooves on the molds to assist in removing the bottles. One of the jobs Hina did was to operate the mill. When Hina first started working for Anchor, he used a Kearney & Trecker mill ("KT mill"). Working the KT mill was Hina's primary job classification, so he ran it about 60 percent of his work schedule of a 48 to 56 hour week.

In 1987, Anchor acquired a Cincinnati Horizontal Milling Machine (the "Cincinnati mill"

or the "mill") and stopped using the KT mill. Hina never received formal training on the Cincinnati mill. Hina was trained, however, on how to run milling machines similar to the Cincinnati mill during his apprenticeship. Hina had lots of experience with the Cincinnati mill and used it thousands of times before his accident.[1] At the time of his accident, by Hina's own admission, he was the most qualified person to run the Cincinnati mill.

## 2. Mill Operation

Before using the Cincinnati mill, the operator had to set the spindle speed by using a dial. The appropriate spindle speed varied, depending on the number of cutters used and the type of metal to be cut. The spindle speed dial was immovable without the mill's power being on, but the dial could also not be moved while the spindle was moving. The speed indicated by the spindle speed dial was not always accurate because the vibrations from the mill would make the dial move, so the operator had to move the dial and then start the spindle to check if the speed was correct. In order to determine whether the mill was running at the proper speed, the operator would have to look at "the amount of chip load that the cuttings come out, the size of the cutting, the temperature of the cutting, the smoothness of the operation. All those things combined." (Hina depo. pp. 73-74.) If the speed was not correct, the operator would stop the spindle, move the dial, and check the speed again by starting the spindle.

The mill also had a spindle activation lever which would start and stop the rotating spindle that was attached to the cutters that made the requisite cuts. The lever vibrated out of position, so it was secured by rubber bands. The lever was not original to the mill, but rather,

_____

[1]At the time of his accident, the Cincinnati mill was only sporadically used.

was a replacement that was longer than the original lever.[2] The lever, approximately three feet long, was located at chest level of an employee of average height. Moving the lever to the right activated the spindle. In the off position, the lever was perpendicular to the mill. When the lever vibrated out of position, it could cause the cutters' tips to break, necessitating their replacement. The lever could vibrate out of position either because it was not properly secured by rubber bands or because the speed of the mill was not correctly set, or both. When the cutters' tips were broken, the operator would check the speed of the cutters and the security of the rubber bands before operating it again, and would adjust or replace the rubber bands if necessary.

### 3. Mill Accident

On November 5, 2003, Hina was assigned to the job of using the Cincinnati mill to cut grooves. On that day, Hina found that the cutters' tips were broken because the lever had vibrated out of position. Hina replaced the cutters' tips before setting up the mill for operation. Replacing the cutters' tips had nothing to do with Hina's accident.

At the time of the accident, Hina was setting up the mill. He adjusted the speed dial to establish the correct cutter speed. Because the speed dial was not reliable, he had to go to the side of the mill and engage the spindle activation lever in order to rotate the cutters so that he could observe the rotating cutters and adjust the speed.

---

[2]Anchor maintains that it did not modify the Cincinnati mill. (Steve Brock aff. ¶ 13.) Hina, however, testified, that the lever was replaced with a longer lever while he was working at Anchor. (Hina depo. p. 72.) He does not know when the activation lever was replaced, though he testified all the changes to the mill occurred in the seven to eight years prior to his accident. (*Id.*) Plaintiff's expert, Gerald Rennell, testified that the lever on the mill when Hina was injured was not the original mill lever and placed the operator's hand seven inches closer to the cutters (Rennell depo p. 45.) As this is a motion for summary judgment, this Court must construe the facts in the light most favorable to Hina and assume the lever was replaced by Anchor.

Hina does not recall what occurred after he went to the side of the mill, and there are no witnesses. Hina's left hand and arm became entangled in the cutters. The cutters were rotating when Hina was injured, which indicates that the spindle activation lever had been activated, either intentionally or accidently. If Hina intentionally activated the spindle activation lever, he would have activated it with his right hand. Hina has no idea how his left hand and arm got into the cutters, except he knows it was inadvertent. Hina was wearing gloves, which were common for operators to wear when operating the Cincinnati mill. Anchor had actually supplied the gloves to Hina, though it was not required that Hina wear the gloves.

When Anchor found Hina, he was flush against the mill, with his body against the spindle activation lever, holding it in the "on" position. His gloved left hand was caught in and shredded by the mill's unguarded cutters. He was severely injured and has had many surgeries to restore minimal function to his left hand and arm. After the accident, Anchor pulled the mill out of service and moved it to a different part of the plant and out of the general work area.

### 4. Hina's Prior Car Accident

Hina was in a car accident in 1973 and suffered injury as a result, resulting in him having a limp that caused him to drag his left foot.[3] Hina asserts that coworkers and management joked about his condition, including his tendency to trip or stumble. The problems with his limp got worse as he aged. Hina, however, never requested that anyone at Anchor make any special accommodations for him and never told anyone at Anchor that there were some operations he

---

[3]Hina asserts that he suffered "severe brain damage." There is no evidence that anyone in management at Anchor knew that Hina suffered brain damage or that Hina has actually been diagnosed as having brain damage. The evidence shows they only knew about his injury that caused him to drag his left foot.

could not perform because of his limp. He was not required to wear any special equipment or use a cane or crutch due to his limp.

It is unknown whether Hina stumbled into the mill on the day of his accident or if a stumble played a part in his accident. No member of Anchor management is aware of Hina ever falling around the mill prior to the accident. Hina had fallen about three times at work in the total time of his employment, though there is no evidence that anyone else at Anchor was aware of these falls. Hina testified that he was physically and mentally competent to work on the Cincinnati mill doing the job he was performing on the date of the accident, and did not have any apprehension or reason to think he was going to be injured.

### 5. OSHA Citation

On November 12, 2003, Anchor was cited by the Occupational Safety and Health Administration ("OSHA") for a repeat violation pursuant to 29 CFR § 1910.212(a)(3)(ii) because "Point(s) of operation of machinery were not guarded to prevent employee(s) from having any part of their body in the danger zone(s) during operating cycle(s)." Specifically, the citation stated that "the point of operation on the Cincinnati Horizontal Milling Machine . . . was not guarded. . . . an employee's left arm was caught in the unguarded cutting blades." Anchor was previously cited for a violation of this same OSHA standard on January 22, 2001. That violation occurred in the duplicating department, as opposed to the molding department, and occurred on a Monarch Tracer Lathe.

### B. Procedural History

### 1. State Court

Following the accident, Hina was severely injured, and a workers' compensation claim

was allowed. Hina filed an application for an additional award based upon Anchor's alleged violation of specific safety requirements ("VSSR"). Hina alleged that Anchor failed to provide a way for disengaging the mill from its power supply and failed to provide a device to lock the controls of the mill in the off position when the mill was shut down. On March 16, 2006, a hearing was held before a staff hearing officer from the Industrial Commission of Ohio ("Industrial Commission"). The hearing officer concluded that there was no VSSR.

Hina subsequently filed an action in mandamus in the Tenth Appellate District, Franklin County, requesting a writ to compel the Industrial Commission to vacate its order finding no VSSR. On September 6, 2007, the Tenth District determined that Anchor violated Ohio Admin. Code 4121:1-5-05(D)(1) because "the milling machine had no means within easy access of the operator for disengaging the machine from its power supply." *State ex rel. Hina v. Indus. Comm'n*, No. 07-AP-23, 2007 WL 2505261, at *2 (Ohio Ct. App. Sept. 6, 2007). The Tenth District therefore vacated the finding that no VSSR had occurred and directed that the Industrial Commission enter an order that a VSSR existed and assess an appropriate award for the VSSR, "following a determination of whether or not the VSSR was a direct and proximate cause of Mr. Hina's injuries." *Id.*

On January 28, 2009, the Ohio Supreme Court reversed the finding of the Tenth District, finding that the spindle activation lever was an effective means of disengaging the mill from the power supply, thus complying with the specific safety requirement. *State ex rel. Hina v. Indus. Comm.*, 901 N.E.2d 221.

## 2. Federal Court

On January 4, 2005, Hina and Hina's wife, Amy Dunn ("Dunn"), sued Anchor. Hina

asserts an employment intentional tort claim. Dunn asserts a loss of marital consortium claim. Anchor filed a Motion to Dismiss on August 5, 2005. On September 24, 2008, this Court denied the Motion to Dismiss. Anchor now seeks summary judgment on Hina's and Dunn's claims.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P.56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### IV. LAW AND ANALYSIS

#### A. Intentional Tort Claim

In most circumstances, an employee injured in the course of employment is limited to redress through the Ohio Workers' Compensation Act, Ohio Revised Code § 4123.90. The

Workers' Compensation Act, although generally comprehensive, contains certain limited exceptions. One such exception exists for injuries resulting from an employer's intentional tort upon an employee. To establish an intentional tort claim under Ohio law, an injured worker must demonstrate:

(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;

(2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and

(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

*Fyffe v. Jeno's, Inc.*, 570 N.E.2d 1108, 112 (Ohio 1991). Evidence showing that the employer was negligent or even reckless is insufficient to satisfy these factors. *Jandro v. Ohio Edison Co.*, 167 F.3d 309, 313 (6th Cir. 1999). "[I]t must be shown that the employer '(1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employer's act and, despite this knowledge, still proceeded.'"*Id.* (quoting *Mitchell v. Lawson Milk Co.*, 532 N.E.2d 753, 756 (Ohio 1988)). Hina maintains that Anchor committed an intentional tort by requiring him to work on the Cincinnati mill even though Anchor knew the mill was dangerous and knew it was substantially certain that he would injure himself.

### 1. Knowledge of Existence of Danger

Hina alleges that Anchor had knowledge of a dangerous condition because Anchor knew that the mill was dangerous, knew Hina wore gloves, and knew about Hina's tendency to trip and stumble. The plaintiff must show, by a preponderance of the evidence, that the employer had

"actual knowledge of the exact dangers which ultimately caused" injury. *Smith v. Gen. Motors Corp.*, 172 F. App'x 661, 666 (6th Cir. 2006) (quoting *Sanek v. Duracote Corp.*, 539 N.E.2d 1114, 1116-17 (Ohio 1989)). Anchor contends that Hina does not know what caused his injury. Therefore, Anchor avers, Hina cannot show that Anchor knew of the exact dangers which ultimately caused his injury.

This Court finds that Hina does not have to show what ultimately caused his injury if all conditions that could have caused his injury were dangerous and known to Anchor. It would not make sense to allow an employer to avoid liability because an employee cannot establish which of two dangerous conditions caused his injury, provided the employer was aware of both dangerous conditions.

Hina had to engage the spindle activation lever so that he could observe the rotating cutters and adjust the speed. That lever placed Hina less than a foot from the unguarded cutters. Hina was wearing company provided gloves at the time he was injured, which if they got too near the cutters, could pull his hand inside. Hina also had a limp which could cause him to trip and stumble. Hina does not recall what occurred after he went to the side of the mill. Hina was injured, however, while on the side of the mill because his left hand either fell into or was pulled into the mill.[4] Hina knows he did not purposely place his hand in the mill. Against this factual backdrop, there appear to be four possibilities as to how Hina was injured:

> (1) Hina fell or slipped into the spindle activation lever, causing it to become activated, and continued to fall into the mill with his left hand.

> (2) Hina fell or slipped into the spindle activation lever, causing it to become activated, and subsequently while regaining his balance or after regaining his

---

[4]Hina's left hand is not the hand he would use to activate the lever.

balance, his left hand got too close to the mill and was pulled in.

(3) Hina intentionally engaged the spindle activation lever with his right hand, then fell or slipped, causing his left hand to fall into the mill.

(4) Hina intentionally engaged the spindle activation lever with his right hand, then his left hand got too close to the mill and was pulled in.

According to Gerald Rennell ("Rennell"), Plaintiffs' expert witness, whether Hina got to the spindle activation lever and slipped and fell against it or whether he activated the spindle activation lever on purpose does not matter. (Rennell depo. p. 59.) "The fact of the matter is you put him there in that position with it moving, you know it's going to be moving, that's the accident that's waiting to happen." (*Id.*)

Construing the evidence in the light most favorable to Hina, Anchor: (1) knew that Hina had to go to the side of the mill and engage a lever that was less than a foot from the cutters; (2) knew that the cutters were unguarded; (3) knew that many of its employees wore company provided gloves, even though such gloves made it more likely an employee could be pulled into the mill; and (4) knew Hina had a tendency to trip and stumble. Regardless of the manner in which Hina was injured, Hina has presented sufficient evidence to demonstrate a genuine issue of material fact as to whether Anchor knew about the dangerous conditions that led to his injury. Hina has, therefore, satisfied the first prong of *Fyffe*.

## 2. Substantial Certainty

The employee at all times has the burden to demonstrate that the employer had knowledge amounting to substantial certainty that an injury would take place. *Pariseau v. Wedge Products, Inc.*, 522 N.E.2d 511, 514 (Ohio 1988). The substantial certainty standard is a difficult one to satisfy. *Royer v. Tigerpoly*, No. 2:05-cv-1134, 2007 WL 1362612, at *8 (S.D. Ohio May

7, 2007). As the Sixth Circuit has stated,

> It is not enough that the harm was likely to occur. Nor is it enough that there was a high risk of it occurring. Rather, it must have been substantially certain to occur. . . . This second prong of the *Fyffe* test holds that the mere knowledge and appreciation of a risk-something short of substantial certainty-is not intent.

*Jandro*, 167 F.3d at 314-15; *see Ford v. Complete Gen. Const. Co.*, No. 06AP-394, 2006 WL 3805684, at *9 (Ohio Ct. App. Dec. 28, 2006) (internal quotations and citation omitted) ("Even if it were probable that injury would occur if an employee was exposed to a danger enough times, we have previously held that there is a difference between probability and substantial certainty."). This is a high threshold that Hina must satisfy.

> There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an "intentional tort."

*Woods v. Gen. Motors Corp.*, No. 98-3560, 1999 WL 685926, at *4 (6th Cir. Aug. 25, 1999) (quoting *Richie v. Rogers Cartage Co.*, 626 N.E.2d 1012, 1016 (Ohio Ct. App. 1993)).

Hina asserts that it was substantially certain that he would be injured on the Cincinnati mill because: (1) the spindle activation lever was too close to the cutters; (2) he was provided gloves by Anchor and not trained to not wear gloves around moving machinery; (3) he had a tendency to trip and stumble; and (4) the cutters were unguarded, there had been a prior injury related to an unguarded machine, and Anchor received an OSHA citation for the unguarded cutters.[5]

---

[5]To the extent that Hina asserts Anchor was substantially certain that he would be injured because of an oil leak, because the mill was held together with rubber bands, because the cutter tips were broken, or because the speed dial was broken, the Court finds no merit to these

### a. Location of Lever

Hina contends that the spindle activation lever ("replacement lever") was too close to the cutters, and thus, this made it substantially certain he would be injured on the mill. The replacement lever replaced the original lever that came on the mill. The replacement lever was longer than the original lever and placed the operator's hand about seven inches closer to the cutters.

The replacement lever had been on the mill for approximately seven to eight years prior to Hina's accident.[6] Anchor never received an OSHA citation for the replacement lever either before or after the accident. Nevertheless, the location of the replacement lever placed Hina under a foot from the unguarded cutters. This meant that if Hina tripped or slipped during or after the engagement of the replacement lever, there was a risk that he would fall into the mill. This alone did not make it substantially certain that Hina would be injured, but it is one factor in the substantial certainty analysis.

### b. Lack of Training to Not Wear Gloves

Hina contends that he was never trained on the Cincinnati mill, and thus, this made it

---

contentions. Hina has not put forth any evidence that any of those conditions played any role in his accident.

First, though Hina mentions an earlier oil leak on the mill, he does not assert that there was oil on the floor during his accident or that he may have slipped on oil. Second, though the mill was held together with rubber bands, there has been no evidence that Hina was trying to set up or secure the rubber bands when he was injured. Third, though the cutter tips were broken the day of the accident when Hina began work, he replaced those tips. After replacing them, he began setting up the mill, and was subsequently injured. Fourth, though the speed dial was broken, this also had nothing to do with Hina being injured.

[6]Hina cannot remember when the lever was replaced, though he believes all changes to the mill were made seven to eight years before his accident.

substantially certain he would be injured on the mill. Hina has not set forth any evidence, however, as to how a lack of training in the operation of the mill made it substantially certain that he would be injured. Namely, he does not contend that he did not know how to set up the Cincinnati mill and this led to his injury, or that he ran it incorrectly and this led to his injury.[7] Hina contends, however, that a lack of training to not wear gloves when operating the mill made it substantially certain he would be injured on the mill.

The operator's manual for the Cincinnati mill stated that the operator "must read and understand these precautions completely before operating, setting up, running, or performing maintenance on the machine." It also stated, "[f]ailure to follow safety instructions may result in serious personal injury." One of the safety instructions the manual provided was that "gloves . . . must not be worn around moving machinery."

Hina was never provided the manual to read, and did not even know of the manual's existence. Hina was never told not to wear gloves while operating the mill, and there was no Anchor policy against wearing gloves while operating the mill. In fact, Anchor provided gloves for Hina to wear, though Anchor did not require the gloves be worn. Hina wore those gloves to

_____

[7]Hina testified that he was trained on how to run "horizontal and vertical milling machines similar to the [Cincinnati mill]" during his apprenticeship. (Hina depo. pp. 10-11.) Hina had lots of experience with the Cincinnati mill and used it thousands of times before his accident. At the time of his accident, by Hina's own admission, he was the most qualified person to run the Cincinnati mill and he was good at running the mill. (*Id.* p. 77.) This Court notes, nevertheless, that even though Hina used the mill thousands of times before his accident and was the most qualified employee at Anchor to run the mill, this does not mean he was running the mill correctly. If Hina had put forth evidence that he set up the mill incorrectly or was running the mill incorrectly and this led to his injury, then even though he was experienced, his lack of training may have made it substantially certain that he would be injured. The evidence presented, however, does not show that lack of training in the operation of the mill played any role in his accident.

operate the mill on a regular basis. When Hina was injured, his gloved left hand was found

caught in the cutters. It is unknown whether Hina's gloves played any role in his accident.

Therefore, it is at least possible that Hina was injured because his hand got too close to the

cutters and was pulled in because he was wearing gloves.

Anchor's failure to train its employees to not wear gloves, on its own, cannot establish

that Anchor was substantially certain that Hina would be injured. *See Smith*, 172 F. App'x at 669

("Under Ohio law, GM's failure to prohibit its employees from wearing loose fitting coveralls

and ponytails [in violation of GM's safety policies] . . . is not egregious enough to find that GM

had the inferred intent required for an intentional tort."). Nevertheless, Anchor's failure to train

its employees to not wear gloves, in direct contravention of the operator's manual, is one factor

in the substantial certainty analysis.

### c. Hina's Tendency to Trip and Stumble

Hina had a limp that caused him to drag his foot behind him, and thus trip and stumble.

Anchor was aware of Hina's limp. Hina asserts that his limp grew worse with age.  Due to his

limp, Hina contends this made it substantially certain that he would be injured on the mill.

Anchor had a safety committee that conducted a monthly discussion of possible hazards

and conducted a monthly walk through of the plant for the purpose of identifying potential

hazards. (Kevin Niggemyer aff. ¶ 9A.) Kevin Niggemyer ("Niggemyer"), a member of Anchor

management charged with plant safety, testified that the committee never identified Hina's limp

as posing any safety concern. (*Id.*) No grievance or other action was initiated by the union with

respect to Hina's ability to work safely. (*Id.* ¶ 9B.) At no point did anyone ever bring a concern

to Niggemyer regarding Hina's ability to work safely, and at no time did Hina suggest any

concern regarding his ability to work safely. (*Id.* ¶¶ 9D, 9F.) Niggemyer asserts he never observed Hina having any difficulty with his limp (*Id.* ¶ 9F.) In addition, Hina testified that he had fallen probably three times at work in the total of his employ. (Hina depo. pp. 57-58.) He also testified that all those falls were due to the floor being inclined. (*Id.*) There was no incline or change in elevation in the floor area around the Cincinnati mill. (*Id.* pp. 58-59.)

On the other hand, Phillip Bauserman ("Bauserman") is a former utility worker who did janitorial work, packing, stock moving, and unloading of trucks while employed at Anchor. He never operated any of the milling machines. He was laid off by Anchor in September of 2008. He claims that Hina frequently stumbled at work. (Bauserman aff. ¶ 3.) He also claims that members of Anchor management made jokes about Hina's tendency to trip and stumble as a result of his limp (*Id.*) He asserts that he said to Steve Hoffer ("Hoffer"), another member of management, "Don't you worry about [Hina] getting hurt on [the Cincinnati mill]?" (Bauserman depo. p. 28.) And according to Bauserman, Hoffer replied, "He's run it before. He will be okay. Just take the stuff over there to the machine." (*Id.* p. 29.)

Michael Emmert ("Emmert") is a journeyman mold maker for Anchor who is the Union President and a member of the plant safety committee. He claims that Hina "stumbled on a daily basis at work. By stumble, I mean start to fall but catch himself before he actually fell to the ground." (Emmert aff. ¶ 3). He testified, "it happened with regularity where [Hina's] foot would catch on the mat and he would – he would look like he was getting ready to fall because that foot drug. It drug all the time. It would scare me." (Emmert depo. p. 54.) Emmert asserts he was concerned that Hina would fall into the mill and be seriously injured. (*Id*.) He alleges he took his concern to the Plant Manager, Steve Brock ("Brock"), telling Brock it was only a matter of time

before Hina fell into the mill because of his stumbling. (Emmert depo. p. 50.) Emmert alleges he told Brock, "We need to keep him off the machine. We need to get him somewhere else. That dog-gone thing is dangerous for him to run." (*Id.* pp. 50-51.)

Construing the evidence in the light most favorable to Hina, Anchor's knowledge that Hina had a tendency to trip and stumble coupled with the fact that two employees had gone to management with concerns about Hina's safety are additional factors in the substantial certainty analysis.

### d. Unguarded Cutters

Hina asserts that Anchor knew that the cutters were unguarded, and this made it substantially certain that he would be injured on the mill. The Cincinnati mill was not manufactured with guards around the sides of the cutters. Rennell, Plaintiffs' expert witness, testified that, "a guard of this type would have prevented the injury to Mr. Hina because he would not have contacted the cutters and the revolving spindle." (Rennell depo. p. 67.)

Having unguarded cutters is certainly a dangerous condition. Due to the location of the lever, when Hina set up the mill for operation, he had to be within a foot of the moving unguarded cutters. And because Hina wore gloves, this made the unguarded cutters more dangerous because he could be pulled in if his gloves got too close. Furthermore, due to Hina's tendency to trip and stumble, having unguarded cutters was particularly dangerous for him. The question is: was it substantially certain that Hina would be injured on those unguarded cutters?

As noted, Anchor had a safety committee that conducted a monthly discussion of possible hazards and conducted a monthly walk through of the plant for the purpose of identifying potential hazards. (Niggemyer aff. ¶ 9A.) The committee never identified the

Cincinnati mill as posing any safety concern because it did not have a guard. (*Id.*) No grievance or other action was initiated by the union with respect to the Cincinnati mill. (*Id.* ¶ 9B.) At no point did anyone ever bring a concern to Niggemyer, who was charged with plant safety, regarding the Cincinnati mill. (*Id.* ¶ 9D.) At no time did Hina suggest any concern regarding the Cincinnati mill. (*Id.* ¶ 9F.) And prior to Hina's injury, the Ohio Bureau of Workers' Compensation ("BWC") performed a consultation to assess plant safety, that included a walkthrough of the complete plant, and the consultant did not identify any aspect of the Cincinnati mill as posing a hazard or requiring action by Anchor. (*Id.* ¶ 9E.)

Anchor also contends that it operated the KT mill two shifts a day for five and a half days a week at least since 1969, the year Hina began working for Anchor, until Anchor acquired the Cincinnati mill in 1987. The KT mill also had unguarded cutters. Until a few years before Hina's accident, the Cincinnati mill ran on the same schedule. Therefore, Anchor asserts, for 34 years, a vertical mill without cutters was used for countless tens of thousands of operations by a number of operators. At no time during those 34 years was any worker injured by operating cutters on either mill until Hina's injury.[8]

That a procedure has been performed thousands of times without prior accident, and over one hundred times by the plaintiff himself, *may* bespeak the fact that an injury was not substantially certain. *See Royer*, 2007 WL 1362612 at *9 (S.D. Ohio May 7, 2007); *see also Taulbee v. Adience, Inc., BMI Div.*, 696 N.E.2d 625, 631 (Ohio Ct. App. 1997) (finding "[p]rior accidents are probative of whether an employer knows that an injury is substantially certain to

---

[8]Hina asserts that the defects in the Cincinnati mill did not occur until around 1995 or 1996. Counting only those years, a "defective" mill was used for about seven or eight years prior to Hina's injury.

-17-

occur . . . the absence of prior accidents 'strongly suggests' that injury from the procedure was not substantially certain to result . . ."); *Foust v. Magnum Rests., Inc.*, 646 N.E.2d 1150, 1153 (Ohio Ct. App. 1994) (same). A lack of prior accidents, however, is not fatal to a plaintiff's case. *Taulbee*, 696 N.E.2d at 631; see also *McDermott v. Cont'l Airlines, Inc.*, No. 2:06-cv-0785, 2008 WL 1766892, at *19 (S.D. Ohio April 11, 2008) (finding prior accidents are just one factor in determining an employer's knowledge that an injury is substantially certain to occur).

> Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of *Fyffe*.

*Id.* (quoting *Cook v. Cleveland Elec. Illum. Co.*, 657 N.E.2d 356, 364 (Ohio Ct. App. 1995)). The court must focus not only on how often similar accidents have occurred, but also on the employer's knowledge of the degree of risk involved." *Id.* Even if there were not prior accidents, other factors could indicate that injury is substantially certain.

In this case, though there had not been an accident on the Cincinnati mill prior to Hina's accident, there was an accident on a machine used for milling in 2001. Anchor was cited for violating the same OSHA standard violated in the Hina accident---having an unguarded point of operation. In the 2001 accident, another employee was injured on a Monarch Tracer Lathe (the "Lathe") that had been modified to perform milling operations. (Niggemyer aff. ¶10A.) In the new mode of operation, milling inside the mold took place such that the point of operation was not visible to the operator. (*Id.*) The operator needed to walk to the other side of the Lathe to visually confirm that the milled cut in the interior of the mold was deep enough. (*Id.*) In the 2001

accident, rather than walking around the Lathe, the operator blindly placed his hand in the mold to feel the milled cut and smashed his finger in the pinch point. (*Id.*)

Though the 2001 accident and Hina's accident occurred in different ways and on different machines, they both occurred for the same reason---there was an unguarded point of operation. If the machines had had guards, the accidents would not have occurred. Anchor received an OSHA citation for the 2001 accident. The 2001 accident, therefore, alerted Anchor to the danger of having an unguarded point of operation.

In 2003, following Hina's accident, the Cincinnati mill's unguarded point of operation was found to be in violation of OSHA. Anchor was cited for a "repeat" violation, the first violation having been the 2001 OSHA citation. A relevant OSHA violation does not evidence the requisite intent unless there is an actual pre-accident citation. *Id.*; *Ferryman v. Conduit Pipe Prods. Co.*, CA2007-02-007, 2007 WL 4225745, at *5 (Ohio Ct. App. Dec. 23, 2007), citing *Sanek*, 539 N.E.2d at 1117. Because Anchor was cited in 2001 for having an unguarded point of operation, prior to Hina's injury, and was again cited in 2003 for having an unguarded point of operation, these two citations provide further evidence that Hina's injury was substantially certain to occur. *See also Gibson*, 2008 WL 4379588, at *9 (finding OSHA citations are one factor to be take into consideration in determining whether harm was substantially certain to occur).

Construing the evidence in the light most favorable to Hina, Anchor knew Hina had to operate a replacement lever on the Cincinnati mill that was less than a foot from unguarded cutters. Anchor knew that Hina wore gloves, and that these gloves made his operation of the mill more dangerous. Anchor also knew that Hina had a tendency to trip and stumble, which made it

particularly dangerous for him to work extremely near to unguarded cutters. Anchor received an OSHA citation in 2001 for having an unguarded point of operation on a different machine, so Anchor knew that having an unguarded point of operation was dangerous, and this was confirmed when Anchor received a citation for the Cincinnati mill in 2003. Taking into account: the location of the lever, that Hina wore gloves, that Hina had a tendency to trip and stumble, and that the cutters were unguarded, a reasonable jury could conclude that the conditions in which Hina worked created such an obvious hazard that Anchor knew that an injury was substantially certain to occur. *See Taulbee*, 696 N.E.2d at 632. Hina has, therefore, satisfied the second prong of *Fyffe*.

### 3. Required to Perform Dangerous Task

Finally, Hina must present evidence that although Anchor was aware of the dangerous conditions and that an injury such as that to Hina was substantially certain to occur, Anchor still required Hina to perform the dangerous task. "[A]n opposing party can satisfy this [*Fyffe* third] requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in the dangerous task." *Hannah v. Dayton Power and Light*, 696 N.E. 2d 1044, 1047-48 (Ohio 1998). Hina testified he was assigned to operate the Cincinnati mill on the day of his accident. To set up the mill for operation, he was required to activate a lever that placed him less than a foot from unguarded cutters, even though he had a limp that caused him to trip and stumble. Hina has, therefore, satisfied the third prong of *Fyffe*.

### B. Loss of Consortium Claim

A claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily

injury. *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992). Hina's cause of action has survived summary judgment, and Anchor has not presented any further grounds for barring Dunn's loss of consortium claim. Therefore, because her claim is derivative of Hina's, and because Anchor has not defeated Hina's claim, Dunn's claim survives as well.

### C. Motion to Strike

Anchor filed a Motion to Strike portions of evidence offered by Plaintiffs (doc. no. 88). First, Anchor moves to strike medical testimony related to Hina's limp. Anchor does not move to strike the lay observations of any witness describing Hina's limp. Second, Anchor moves to strike Rennell's new definition of "substantial certainty." Third, Anchor moves to strike portions of the affidavits of Hina and Bauserman that claim that jokes were made by Anchor management.

As of July 3, 2009, Plaintiffs had not yet responded to Anchor's Motion to Strike, and the deadline for responding had not expired. For purposes of this Opinion and Order, however, this Court has not considered the disputed evidence. Specifically, this Court has not considered testimony asserting Hina has a "disability" or "brain damage," and this Court has not considered Rennell's new definition of "substantial certainty."

Finally, this Court has not considered the specific statements that are alleged to have been told by unidentified coworkers and members of management. Anchor contends that the joke Hina and Bauserman asserts that management told—that Hina would, "trip over a yellow painted line"—is hearsay. This Court finds that the specific content of this joke is hearsay and, as

Plaintiffs have not yet responded, it not been shown that a hearsay exception applies.[9] Nevertheless, the statement by Hina that "management joked about my condition, including my tendency to trip or stumble" is not hearsay because it is not offered for the truth of the matter asserted. Hina is not reciting the contents of a specific joke, but rather, is presenting this as evidence of management's awareness of his condition. Anchor does not move to strike Hina's affidavit statements that are not hearsay.

Therefore, though Plaintiffs had not yet responded to Anchor's Motion to Strike as of July 3, 2009, this Court has not considered any of the evidence Anchor has moved to strike. Even not considering that evidence, this Court still finds that Hina has established a genuine issue of material fact on all three of the *Fyffe* prongs. Therefore, Anchor's Motion to Strike is **MOOTED**.

## V. CONCLUSION

For the foregoing reasons, Anchor's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

　　　**s/ Algenon L. Marbley**　　　　　　
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: July 13, 2009**

---

[9]To qualify as an Admission of a Party Opponent under Federal Rule of Evidence 801(d)(2), it needs to be shown that the joke was made by "a person authorized by the party to make a statement concerning the subject" or was made " by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(C) and (D). This cannot be shown because neither Hina nor Bauserman has identified the person(s) who allegedly made the joke.